UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SPECTRUM NORTHEAST, LLC,

                              Plaintiff,

                                                      Case # 21-CV-6453-FPG

v.

                                                      DECISION AND ORDER

CITY OF ROCHESTER,

                              Defendant.

## INTRODUCTION

Plaintiff Spectrum Northeast, LLC ("Charter") brings this action against Defendant City of Rochester ("the City"), alleging that the City has compelled Charter to pay certain fees related to its cable-television franchise in violation of federal law.  *See* ECF No. 1.  Currently before the Court is the City's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 8.  Charter opposes the motion, ECF No. 10, and the City has filed its reply.  ECF No. 11.  For the reasons that follow, the City's motion is DENIED.

## BACKGROUND

Historically, cable television has been subject to overlapping regulatory authorities.  Although "[t]he Communications Act of 1934 grant[ed] the FCC broad authority to regulate all aspects of interstate communication by wire or radio," municipalities—known as "franchising authorities" in this context—long "exercised authority in regulating cable for the benefit of the residents in their communities."  *ACLU v. FCC*, 823 F.2d 1554, 1558 (D.C. Cir. 1987).  Municipalities decided whether to grant a "franchise," which authorized "a particular company to provide cable service to a specified portion of the community."  *Id.*  "In exchange for a cable franchise, cable operators were required to assume various responsibilities in the public interest.

1

Typically, franchise agreements obligated cable operators to pay a specified 'franchise fee,' and to market their services in accordance with rates established by the municipality." *Id.*

In 1984, Congress enacted the Cable Communications Policy Act, which sought to better allocate federal, state, and local responsibilities in the area. Pub. L. No. 98-549, 98 Stat. 2779. As is relevant here, the 1984 Act imposed a "uniform, federal standard on the level of franchise fees." *ACLU*, 823 F.2d at 1559. Specifically, "[f]or any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services." 47 U.S.C. § 542(b). A "franchise fee" is defined broadly to include "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such." *Id.* § 542(g)(1).

The statute contains five exceptions to that broad definition. *See id.* § 542(g)(2)(A)-(E). Among the exceptions are (1) for any franchise in effect on October 30, 1984, "payments which are required by the franchise to be made by the cable operator during the term of such franchise for, or in support of the use of, public, educational, or governmental [("PEG")] access facilities; and (2) for any franchise granted after 1984, "*capital costs* which are required by the franchise to be incurred by the cable operator for [PEG] access facilities." *Id.* § 542(g)(2)(B), (C) (emphasis added). The importance of PEG facilities and operations was emphasized in the legislative history of the 1984 Act. H.R. Rep. No. 98-934, at 30 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4667. Nevertheless, Congress required that taxes, fees, and assessments made by cable operators in support of PEG facilities be counted towards the statutory cap unless they were for capital costs or were voluntary payments not required by the franchise itself. *See id.* at 65.

2

In 2005, the FCC initiated a rulemaking process to determine whether local franchising authorities' processes "unreasonably impede[d] the achievement of the interrelated federal goals of enhanced cable competition and accelerated broadband deployment and, if so, how the Commission should act to address that problem." 20 FCC Rcd. 18581, 18582 (Nov. 18, 2005). After reviewing a "voluminous record generated by the rulemaking proceeding," the FCC "ascertained the need for new rules to ensure that the local franchising process operated in a fully competitive fashion, free of barriers to entry." *All. for Cmty. Media v. FCC*, 529 F.3d 763, 770 (6th Cir. 2008) (internal quotation marks). In March 2007, the FCC released its order, which sought to address the problems with the processes employed by local (*i.e.*, county and municipal) franchising authorities. *See* 22 FCC Rcd. 5101 (Mar. 5, 2007) [hereinafter "the First Order"]. It did so by adopting rules related to 47 U.S.C. § 541(a)(1), which prohibits a franchising authority from "unreasonably refus[ing] to award an additional competitive franchise" to a new cable entrant.

Among the problems the FCC learned through the rulemaking process was that local franchising authorities often made unreasonable demands for payments which were not to be counted towards the statutory franchise-fee cap, including demands related to support for PEG facilities and operations. 22 FCC Rcd. at 5122-24. The FCC determined that a local franchising authority's "refusal to award an additional competitive franchise because of an applicant's refusal to accede to [franchise-fee] demands that are deemed impermissible [] shall be considered to be unreasonable" under Section 541(a)(1). *Id.* at 5145.

The FCC noted that the "general law with respect to franchise fees should be relatively well known," but it decided to "restate the basic propositions [in the First Order] in [an] effort to avoid misunderstandings that can lead to delay in the franchising process as well as unreasonable

3

refusals to award competitive franchises." *Id.*  The FCC clarified that payments towards capital costs for PEG facilities are not "franchise fees" subject to the 5% statutory cap.  *Id.* at 5150-51. Those costs "are distinct from payments in support of the use of PEG access facilities.  PEG support payments may include, but are not limited to, salaries and training.  Payments made in support of PEG access facilities are considered franchise fees and are subject to the 5 percent cap." *Id.* at 5151.  This interpretation is consistent with the negative implication of Section 542(g)(2)(B)-(C).  *See  Cable TV Fund 14-A, Ltd. v. City of Naperville*, No. 96-C-5962, 1997 WL 433628, at *12 n.23 (N.D. Ill. July 28, 1997) ("The fact that Congress elected to use differing terminology in defining what constitutes a franchise fee for post and pre-October 30, 1984 franchises indicates Congress' intent to draw a clear distinction between 'payments . . . for, or in support of the use of, PEG access facilities' and 'capital costs . . . for PEG access facilities.'").  While the FCC did not believe that it was unreasonable to require applicants to provide financial support to PEG operations and facilities, it concluded that "required PEG support costs are subject to the franchise fee cap."  22 FCC Rcd. at 5153; *see also id.* at 5152 (noting that "non-capital costs of [PEG] requirements" must be "offset from the cable operator's franchise fee payments").

The First Order preempted any local laws, regulations, and franchise agreements that conflicted with the First Order and were not "specifically authorized by state law."  22 FCC Rcd. at 5156-57.  This included any local laws or franchise agreements that "authorize or require a local franchising authority to collect franchise fees in excess of the fees authorized by law."  *Id.* at 5162. The FCC did not extend the First Order to state-level regulation, because it "lack[ed] a sufficient record to evaluate whether and how such state laws may lead to unreasonable refusals to award additional competitive franchises."  *Id.* at 5156.  In June 2008, the Sixth Circuit upheld the First Order against various challenges. *See All. for Cmty. Media*, 529 F.3d at 766-67, 787.

After issuing the First Order, the FCC initiated another rulemaking process, asking for comment on the issue of whether the First Order's rules and guidance should apply to existing franchisees. 22 FCC Rcd. at 5164. In November 2007, it issued an order on its findings. 22 FCC Rcd. 19633 (Nov. 6, 2007) [hereinafter "the Second Order"]. The Second Order "extend[ed] a number of the rules promulgated [in the First Order] to incumbents as well as new entrants," including those pertaining to payments made to support the operation of PEG facilities. *Id.* at 19633, 19638. The FCC reasoned that Section 542 "does not distinguish between incumbent providers and new entrants," and "[a]s a result, to the extent that a franchise-fee requirement is found to be impermissible under Section 622, that statutory interpretation applies to both incumbent operators and new entrants." *Id.* at 19637-38. Indeed, the FCC observed that the requirements related to franchise fees were not "entirely new pronouncements" but simply recognition of "the state of existing law on point." *Id.* at 19638 n.30. Thus, "the finding . . . that the non-capital costs of PEG requirements must be offset from the cable operator's franchise fee payments is applicable to incumbents because it was based upon [the] statutory interpretation of [the 1984 Act]." *Id.* at 19639.

In 2017, the Sixth Circuit vacated certain determinations in the Second Order related to in-kind exactions required by franchise agreements. *See Montgomery Cty., Md. v. FCC*, 863 F.3d 485 (6th Cir. 2017). Additional rulemaking proceedings occurred in response. In August 2019, the FCC issued an order adopting more rules and guidance. 34 FCC Rcd. 6844 (Aug. 2, 2019) [hereinafter "the Third Order"]. The FCC concluded "that cable-related, 'in-kind' contributions required by a cable franchise agreement are franchise fees subject to the statutory five percent cap on franchise fees set forth in section 622 of the Act, with limited exceptions, including an exemption for certain capital costs related to [PEG] channels." *Id.* at 6845. That ruling applied to

"both new entrants and incumbent operators." *Id.* at 6858.  The FCC also clarified the meaning of "capital costs" for purposes of Section 542(g)(2)(C), ruling that the term "would be understood to mean a cost incurred in acquiring or improving a capital asset," including "equipment purchased in connection with PEG access facilities." *Id.* at 6866.

The FCC declared that the Third Order was "prospective," such that "cable operators may count only ongoing and future in-kind contributions toward the five percent franchise fee cap after the Order is effective." *Id.* at 6877.  The FCC further ordered, "To the extent a franchise agreement that is currently in place conflicts with this Order, we encourage the parties to negotiate franchise modifications within a reasonable time." *Id.* at 6877-78.  It believed that "120 days should be, in most cases, a reasonable time for the adoption of franchise modifications." *Id.* at 6878 n.247.  But the FCC cautioned that "[i]f a franchising authority refuses to modify any provision of a franchise agreement that is inconsistent with this Order, that provision is subject to preemption under section 636(c)." *Id.* at 6878.  Finally, the FCC extended the rulings in the First, Second, and Third Orders to state-level regulations and franchising.  34 FCC Rcd. at 6904.  In May 2021, the Sixth Circuit upheld the Third Order in relevant part.  *See City of Eugene, Or. v. FCC*, 998 F.3d 701 (6th Cir. 2021).

In June 2021, Charter brought the present action.  ECF No. 1.  Charter is a "cable operator" authorized to "offer broadband, voice, and cable services to residential and commercial subscribers" in Rochester.  ECF No. 1 ¶ 11.  In 1992, Charter's predecessor in interest had executed a franchise agreement with the City, under which it was granted the right to "construct, erect, operate and maintain a cable system" within the City.  ECF No. 1-1 at 6.  At some unidentified point, the original term of the franchise agreement expired.  ECF No. 1 ¶ 31.  Charter alleges that thereafter, the terms of the franchise agreement remained in effect by virtue of a "temporary

operating authority" ("TOA") issued pursuant to New York and federal law.  *Id.*  Charter does not

set forth the conditions of the TOA in its complaint, nor does it identify the issuing authority or

agency, but the Court understands Charter to be alleging that, while the parties' contractual

relationship under the franchise agreement has formally ended, the same duties and benefits exist

by virtue of the fact that they have been incorporated into the TOA.

Under the franchise agreement—and thus, the TOA—Charter is obliged to pay the City

five percent of its gross revenues, on a quarterly basis, as a franchise fee.  ECF No. 1-1 at 15.  This

is the maximum amount permissible under federal law.  *See* 47 U.S.C. § 542(b).  In addition to the

franchise fee, the City also receives several other benefits under the agreement.  Among other

things, the City receives an annual grant from Charter for PEG programming and operations.  *See*

*id.* at 11.  That annual grant can be used "for the administration and operation of the [public access]

channel, as well as for the maintenance, repair and replacement, including upgrade, of the

equipment and facilities."  Rochester City Code § 4A-14(B)(3).  The franchise agreement provides

that Charter "shall not charge against the franchise fee in any way the expenses incurred in

supporting access programming and in meeting the requirements of this Agreement and the City

Code."  ECF No. 1-1 at 15.  On its face, this provision may conflict with Section 542, to the extent

it could be read to suggest that financial support for PEG operations is not a "franchise fee" subject

to the statutory cap.  *See* 47 U.S.C. § 542(g)(2)(C).

For the last several years, Charter has been negotiating a new franchise agreement with

the City.  ECF No. 1 ¶¶ 32, 33.  During negotiations, Charter has taken the position that "PEG

support costs paid by Charter" must be "treated as a franchise fee where required under federal

law," including where "Charter pays for support of the administration and operation of public

access television programming."  *Id.* ¶ 33.  Charter alleges that, despite its "repeated requests," the

City has never provided "any evidence to suggest that any portion" of the annual grant "has been used for anything other than PEG operating and administrative costs." *Id.* ¶ 34.  As a result, Charter maintains that the annual grant is a "franchise fee" subject to the statutory cap—which, because Charter already pays the City 5% of its gross revenues each quarter, means that the City "has extracted franchise fee payments in amounts that exceed the mandatory 5% ceiling established under federal law." *Id.* ¶ 65.

In February 2021, Charter took the step of reducing one of its quarterly franchise-fee payments to offset contributions it had made for public access programming. *Id.* ¶ 42; ECF No. 1-5 at 2-3.  In response, the City accused Charter of breaching the franchise agreement and threatened to assess daily penalties and revoke the franchise unless Charter continued making the public-access contributions.  *See* ECF No. 1-6 at 2-5.  Charter has since chosen to make those contributions "under duress and protest."  ECF No. 1-7 at 5.

Charter then filed the present action.  ECF No. 1.  It raises the following claims: (1) a claim for declaratory relief validating Charter's position on the annual grant; (2) a claim for "money had and received"; and (3) a claim for unjust enrichment.[1]  ECF No. 1 at 20-26.

## DISCUSSION

Moving under Rules 12(b)(1) and 12(b)(6), the City raises a variety of jurisdictional and substantive grounds for dismissal.  Before delving into the City's specific arguments, the Court addresses two matters that will focus its analysis.

First, many of the arguments the City raises are perfunctory and undeveloped.  For example, the City asserts that Charter is "estopped" from "alleging illegality of the underlying terms of the law"; that Charter has "unclean hands"; that Charter's requests for relief are "an

---

[1] Charter also seeks injunctive relief.  *See* ECF No. 1 ¶¶ 76, 84.

impossibility"; that Charter failed to show it will "suffer hardship by the withholding of judicial consideration"; that the money comprising the annual grant did not belong to Charter because it passed those costs onto customers; and that 47 U.S.C. § 555 limits judicial review.  ECF No. 8-1 at 15, 17, 27, 29; ECF No. 11 at 13.  In each case, the City does no more than invoke a proposition; it fails to meaningfully explain its argument, cite any applicable legal authority, or apply said authority to the present dispute.[2]  It is not the Court's responsibility to develop the City's scattershot assertions into discernible legal arguments.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)  ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); *Max M. v. New Trier High Sch. Dist. No. 203*, 859 F.2d 1297, 1300 (7th Cir. 1988) (declining to address issue where litigant simply "point[ed] a finger at a particular clause" without developed argument).  Accordingly, the Court will not address any of the City's undeveloped legal assertions.  The City is free to raise them at an appropriate time in the future, but the Court emphasizes that the City, like any litigant, has "an obligation to spell out its arguments squarely and distinctly."  *Zannino*, 895 F.2d at 17 (internal quotation marks omitted).

Second, as will be discussed below, the Court rejects the remaining arguments the City marshals in favor of dismissal.  But the Court's conclusion should not be understood to mean that one or more of Charter's claims are legally cognizable—only that the City's arguments do not merit relief.  This Court has no obligation to assess the ultimate viability of Charter's claims *sua sponte*, and, given the complexities and overlapping regulatory schemes bearing on the parties'

---

[2] Furthermore, in one instance, the City relies on rescinded—and therefore immaterial—legal guidance.  Specifically, the City quotes an FCC order issued in November 2019 to argue that "self-help via self-offset is never an option" under the FCC's Third Order.  ECF No. 11 at 9-10.  But only months later, the FCC expressly disavowed the portions of the November 2019 order on which the City relies.  *See* 35 FCC Rcd. 932, 934 (Feb. 11, 2020).

relationship, it will not do so at this juncture.[3] *See, e.g.*, *Andritz Hydro Canada, Inc. v. Rochester Gas & Elec. Corp.*, No. 20-CV-6772, 2021 WL 3115425, at *9 n.12 (W.D.N.Y. July 22, 2021).

With these matters clarified, the Court proceeds to the substance of the City's motion.

## I.   Rule 12(b)(1)

The City argues that the Court lacks subject matter jurisdiction over this action and that Charter's claims are not ripe for adjudication.  Charter counters that federal-question jurisdiction exists and that its claims are ripe.  The Court agrees with Charter.

### a.   Legal Standard

"A case may be properly dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Vill. Green at Sayville, LLC v. Town of Islip*, No. 17-CV-7391, 2019 WL 4737054, at *3 (E.D.N.Y. Sept. 27, 2019) (internal quotation marks omitted).  "Where . . . a Rule 12(b)(1) motion is 'facial'— i.e., based solely on the allegations of the complaint or the complaint and exhibits attached to it— the plaintiff has no evidentiary burden in opposing the motion."[4] *High Mtn. Corp. v. MVP Health Care, Inc.*, 416 F. Supp. 3d 347, 351 (D. Vt. 2019).  "In ruling on a facial Rule 12(b)(1) motion, the court must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff." *Id.*

---

[3] For example, the Court does not assess the applicability of 47 U.S.C. § 555a(a), which permits only "injunctive relief and declaratory relief" against "a franchising authority or other governmental entity" where the claim "aris[es] . . . from the regulation of cable service."

[4] Although the City "introduces evidence outside the pleadings" to challenge the Court's subject matter jurisdiction, ECF No. 11 at 11, Charter is entitled to "rely on the allegations" in its complaint because, as discussed below, "the evidence proffered by the [City] is immaterial"—that is, "it does not contradict [Charter's] plausible allegations that are themselves sufficient to show standing." *Carter v. Healthport Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016); *see also* note 5, *infra*.

### b. Analysis

#### i. Subject Matter Jurisdiction

Contrary to the City's argument, the Court concludes that it has federal-question jurisdiction over this action.[5]

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Pritika v. Moore*, 91 F. Supp. 3d 553, 557 (S.D.N.Y. 2015) (internal quotation marks omitted). Under 28 U.S.C. § 1331, a district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Usually, this "arising under" jurisdiction "is invoked by . . . plaintiffs pleading a cause of action created by federal law." *Moore*, 91 F. Supp. 3d at 556. But even where "a claim finds its origins in state rather than federal law, . . . there exists a special and small category of cases in which arising under jurisdiction still lies." *Id.* (internal quotation marks omitted). "Federal courts may exercise jurisdiction over state law claims where it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims." *Id.* (internal quotation marks omitted).

The case of *Broder v. Cablevision Systems Corp.*, 418 F.3d 187 (2d Cir. 2005), is instructive. There, the plaintiff brought a putative class action in state court against a cable-television operator, alleging claims for breach of contract, fraud, unjust enrichment, and violation of New York General Business Law § 349. *See Broder*, 418 F.3d at 192-93. Though he brought state-law causes of action, the premise of all of the plaintiff's claims was in part that the cable operator had violated a federal "uniform rate requirement" by offering a discounted rate to certain customers. *Id.* at 191; *see also* 47 U.S.C. § 543(d). The plaintiff also sought a declaratory

---

[5] In light of this conclusion, the Court need not address the City's argument that diversity jurisdiction does not exist. *See Wagner v. Express Scripts, Inc.*, No. 04-CV-1018, 2004 WL 1052780, at *5 (S.D.N.Y. May 11, 2004).

judgment that the operator's actions violated federal law.  *See Broder*, 418 F.3d at 193.  The operator removed the case to federal court, and, on appeal to the Second Circuit, the plaintiff argued that the district court lacked removal jurisdiction over the action.  *Id.* at 191.

The Second Circuit concluded that the district court possessed federal-question jurisdiction, notwithstanding that the plaintiff brought only state-law causes of action.  It observed that "the existence of a cause of action created by federal law is not a necessary condition for federal-question jurisdiction under 28 U.S.C. § 1331."  *Id.* at 194 (internal quotation marks omitted).  "Instead, the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Id.*

The Second Circuit found this standard met in *Broder*.  The plaintiff's state-law claims— *e.g.*, that the operator "breached a contract term consisting of § 543(d) incorporated by reference" and violated General Business Law § 349 "by failing to provide plaintiff and the Class with the uniform rates required by 47 U.S.C. § 543(d)"—necessarily "raise the [federal] issue of whether [the operator] violated § 543(d)."  *Id.* at 195.  That issue was "actually disputed and substantial," since (a) the parties disputed whether the operator violated federal law, and (b) the issue "involve[d] aspects of the complex federal regulatory scheme applicable to cable television rates, as to which there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum," which could not be deemed "clearly insubstantial."  *Id.* (internal quotation marks).  The Second Circuit therefore found that the district court had "federal-question removal jurisdiction."  *Id.* at 196.

As in *Broder*, federal-question jurisdiction exists in this case.  All of Charter's claims rest on the premise that the annual grant must now be counted towards the statutory franchise-fee cap

*by virtue of federal law.  See* ECF No. 1 ¶¶ 56-63, 70-71, 78-79.  Thus, all of Charter's claims necessarily raise a federal issue—whether federal law does indeed require that such benefits be presently counted as "franchise fees" subject to the statutory cap.  That issue is disputed.  *See generally* ECF No. 8.  And, as in *Broder*, the issue is substantial and involves consideration of a "complex federal regulatory scheme applicable" to cable television operators and state/local franchising authorities.  *Broder*, 418 F.3d at 195.  Accordingly, there is a "serious federal interest in claiming the advantages thought to be inherent in a federal forum," and it is unlikely that the exercise of jurisdiction will disturb "any congressionally approved balance of federal and state judicial responsibilities."  *Id.* at 195-96.  Therefore, federal-question jurisdiction exists.

### ii.  Ripeness

"'Ripeness' is a term that has been used to describe two overlapping threshold criteria for the exercise of a federal court's jurisdiction." *High Mtn. Corp.*, 416 F. Supp. 3d at 351.  "The first requirement—called constitutional ripeness—is drawn from Article III limitations on judicial power and prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur."  *Id.* (internal quotation marks omitted).  "Constitutional ripeness . . . is [essentially] about the first [standing] factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not actual or imminent, but instead conjectural or hypothetical."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (internal quotation marks omitted).

"The second requirement—prudential ripeness—constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it, and allows a court to determine that the case will be better decided later."  *High Mtn. Corp.*, 416 F. Supp. 3d at 351

(internal quotation marks).  "To determine whether to abstain from a case on prudential ripeness grounds," a court proceeds "with a two-step inquiry, requiring [it] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Walsh*, 714 F.3d at 691.  "The 'fitness' analysis is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *Id.*  The "hardship" analysis is concerned with whether "the challenged action creates a direct and immediate dilemma for the parties." *Id.*

The City argues that Charter's claims are not ripe because Charter has not yet negotiated, in good faith, a modification of the franchise agreement.  The City asserts that both the franchise agreement and the Third Order mandate good faith negotiations before cable operators may engage in "self-help" in franchise-fee disputes. *See* ECF No. 8-1 at 7-9.  The City asserts that until Charter engages in such negotiations, Charter has not suffered any redressable hardship, and any dispute is "purely abstract and hypothetical." *Id.* at 27-28.

The City's argument rests on an erroneous assumption—namely, that the federal-law "changes" in the treatment of PEG-support payments could not become operative until the parties formally amended the TOA/franchise agreement.  That assumption cannot be squared with the plain language of the franchise agreement.

The franchise agreement explains how, depending on the circumstances, the parties are to act when there are changes in federal and state law bearing on the franchise.  If federal or state law changes in a manner which "expand[s] the City's authority to regulate cable television," the City must negotiate "in good faith with [Charter] the impact of such [changes] upon the terms and conditions of" the franchise agreement.  ECF No. 1-1 at 17.  If there are changes in federal or state law that "have the effect of permitting amendments to this Agreement, the City and [Charter] shall

meet at either's request and shall negotiate such amendments in good faith." *Id.* And most importantly for the present dispute:

> Should there be changes in federal or state law or regulations governing cable television that have the effect of nullifying a specific term and condition of this Agreement or mandating different requirements with respect to a specific term and condition of this Agreement, *the City and [Charter] shall comply with such changes and may, but need not, execute an appropriate amendment to this Agreement to implement such changes*.

*Id.* at 16-17 (emphasis added).

By the plain language of this term—and especially when it is contrasted with the other modification provisions—neither negotiation nor amendment is necessary when federal law changes so as to "mandate" a different requirement at odds with any of the terms of the franchise. Such deference to federal law is consistent with the franchise agreement's repeated recognition that federal law governs and controls its terms. *See id.* at 4 (recognizing that the City is authorized to grant non-exclusive franchises "by virtue of Federal and State statutes"); ECF No. 1-1 at 7 ("This Agreement has been reached with the understanding that its provisions are controlled by the Federal Communications Act of 1934, as amended [and] the Cable Communications Policy Act of 1984."); ECF No. 1-1 at 17 ("Nothing contained in this Agreement shall constitute a release or waiver of any right, power . . . or immunity which is provided, granted or imposed upon the City or [Charter] under or by virtue of the Cable Communications Policy Act of 1984 . . . ."). Thus, assuming *arguendo* that the treatment of PEG-support payments as "franchise fees" constitutes a recent "change" in federal law, it is a change that the parties agreed they would immediately comply with, and they specifically rejected the City's present claim that negotiation or amendments were necessary.

To the extent the City is arguing that, regardless of the terms of the franchise, the FCC's Orders themselves required the parties to negotiate the treatment of PEG-support payments before

the rules could become effective, the Court remains unconvinced.  To be sure, the FCC's Orders do not provide clear direction on when its rulings would go into effect.  In the Second Order, the FCC stated that its interpretations of Section 542 were "valid immediately" and did not depend on "when various incumbents' franchise agreements [came] up for renewal."  22 FCC Rcd. at 19642. But it also stated that "each [franchise] must be assessed on a case-by-case basis under applicable law to determine whether our statutory interpretation should alter the incumbent's existing franchise agreement," and the FCC denied that the Second Order gave "incumbents a unilateral right to breach their existing contractual obligations."  *Id.*  It requested that parties "work cooperatively" to address any issues.  *Id.*

Regardless of this arguable ambiguity, the Second Order was clear that it did not displace ordinary contractual mechanisms for modification.  Indeed, the FCC explicitly authorized parties to "make adjustments to franchise terms pursuant to compliance with law provisions within the franchise [agreement]."  *Id.* at 19642 n.63.  That is what occurred here: under the franchise agreement, the parties had agreed that they would "comply" with any "changes" in federal law that had the "effect of . . . mandating different requirements with respect to a specific term."  ECF No. 1-1 at 16-17.  While the franchise agreement mandates that PEG-support payments be excluded from the calculation of Charter's franchise fees, *id.* at 15, federal law mandates a different requirement: PEG-support payments, like Charter's annual grant, must be treated as franchise fees subject to the cap unless they are applied to capital costs.  *See* 47 U.S.C. § 542(g)(1), (2)(C). Consequently, pursuant to this modification provision in the franchise agreement, both parties were obliged to comply with federal law despite the contrary language in the franchise agreement and even in the absence of a formal amendment.  The Second Order cannot be read to displace that contractual mechanism.

As for the Third Order, the City is correct that the FCC encouraged parties "to negotiate franchise modifications within a reasonable time"—which it defined as 120 days—if "a franchise agreement that is in place conflicts with [the Third] Order."  34 FCC Rcd. at 6877-78 & n.247. But the FCC later clarified that if those negotiations failed, a cable operator like Charter was entitled "to rely on the processes and remedies that may be contained in their franchise agreement or that are otherwise available."  35 FCC Rcd. 932, 934 (Feb. 11, 2020).  One of the processes available to Charter under the franchise agreement, as incorporated into the TOA, was that it could insist that the City comply with any "changes in federal [law]" without the need for a corresponding "amendment to [the] Agreement."  ECF No. 1-1 at 16-17.  The FCC also permitted a cable operator to "take the dispute to court" once negotiations failed.  35 FCC Rcd. at 934 n.20.

In this case, Charter alleges that, on April 16, 2020, it notified the City of the Third Order and disclosed its intent to treat PEG-support payments as franchise fees subject to the statutory cap.  *See* ECF No. 1 ¶ 37; ECF No. 1-4 at 2-3.  The City "did not make any effort to engage on the issue" until September 11, 2020, when it sent a letter maintaining that "Charter could not offset the [annual grant] . . . against its franchise fee obligation absent a modification to the existing" franchise agreement.  ECF No. 1 ¶ 39.  By that point, however, more than 120 days had elapsed— beyond the "reasonable time" for negotiation set forth in the Third Order.  Therefore, even assuming that the Third Order "conflicted" with the franchise agreement in such a way as to require negotiation, Charter has adequately alleged that the negotiation period passed and that it was henceforth entitled "to rely on the processes and remedies" contained in the franchise agreement and insist upon compliance with federal law.[6]  35 FCC Rcd. at 934.  In this sense, Charter was

---

[6] The City seems to be of the view that the clock did not start on the negotiation period until April 2021, when Charter requested that the parties negotiate the issue of "the franchise fee implications of Charter's continued provision of [in-kind] benefits in light of the 5% cap."  ECF No. 1-7 at 5; *see* ECF No. 8-1 at 8.  That request related to a separate issue—the treatment of in-kind benefits as franchise fees—not the issue of the annual grant.  Viewing the allegations

entitled to engage in "self-help," which included the right to "take the dispute to court." *Id.* at 934 n.20. Conversely, the City was not authorized to "enforce the unlawful franchise provision[]" indefinitely. *Id.* at 933. Once negotiations failed after the "reasonable" period, any inconsistent provision in the franchise agreement was "subject to preemption under section 636(c)." 34 FCC Rcd. at 6878. Accordingly, because the Court rejects the premises underlying the City's ripeness arguments, those arguments must fail.[7] For the same reasons, the City's argument that Charter lacks standing fails. *See* ECF No. 8-1 at 26-27.

## II.   Rule 12(b)(6)

### a.   Legal Standard

A complaint will survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when it states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). A claim for relief is plausible when the plaintiff pleads sufficient facts that allow the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678. In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). At the same time, the Court is not required to accord "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted). Along with the facts alleged in the complaint itself, a court may consider any documents attached to, incorporated by reference

in the light most favorable to Charter, it was in April 2020 that Charter requested negotiations on the issue of the treatment of the annual grant pursuant to the Third Order. *See* ECF No. 1 ¶¶ 37-39; ECF No. 1-4 at 2-3; *see also* note 3, *supra*.

[7] In connection with the Rule 12(b)(6) portion of its motion, the City repeats its arguments regarding the need for negotiations and Charter's use of "self-help." *See* ECF No. 8-1 at 29-31. Because the Court has rejected those arguments, it will not address them below.

in, or integral to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

### b.  Analysis

#### i.  First Claim - Declaratory Judgment

The City contends that declaratory relief is unavailable because Charter has adequate relief "at contract." The Court is not persuaded. "[A] district judge . . . is not precluded from granting [declaratory] relief" simply on the basis that other remedies exist. *Beacon Constr. Co. v. Matco Elec. Co.*, 521 F.2d 392, 397 (1975). Under 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*." 28 U.S.C. § 2201(a) (emphasis added). Likewise, under Rule 57, "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.

Instead, the existence of a "better or more effective remedy" is merely one of several factors to be weighed in deciding whether to exercise jurisdiction over a declaratory action. *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 360 (2d Cir. 2003); *see also Stoncor Grp., Inc. v. Peerless Ins. Co.*, No. 16-CV-4574, 2021 WL 2215558, at *3 (S.D.N.Y. June 2, 2021) (noting that a court "properly may refuse declaratory relief if the alternative remedy is better or more effective"). The City does not meaningfully argue that a claim for breach of contract represents a better or more effective remedy under *Dow Jones*; nor does it address the other relevant factors. *See* ECF No. 8-1 at 28. Absent more developed argument, the Court declines to dismiss the request for declaratory relief on that basis. *See Allstate Ins. Co. v. Essiam*, No. 15-CV-180, 2015 WL 3796243, at *5 (D. Conn. June 17, 2015).

### ii. Second Claim - Money Had and Received

The City argues that the claim for money had and received fails because Charter did not allege payment by mistake.[8]  *See* ECF No. 8-1 at 29.  However, the City fails to marshal any relevant legal authority for the proposition that a "mistake" is a necessary element of a claim for money had and received.  "In New York, the claim of money had and received is an equitable remedy appropriate where (1) defendant received money belonging to plaintiff, (2) defendant benefitted from the receipt of the money, and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money."  *Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 229 (S.D.N.Y. 2003).  New York courts have stated that the remedy "is available if one man has obtained money from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass."  *Parsa v. State*, 64 N.Y.2d 143, 148 (1984).  While "[a]n action for money had and received has been permitted against a public body in instances where plaintiff has paid money by mistake," it has also been permitted where "money has been collected for an illegal tax or assessment[] or property is erroneously taken or withheld by a public official."  *Id.*  Accordingly, the City has not demonstrated that it is entitled to dismissal on this ground.

### iii. Third Claim - Unjust Enrichment

Finally, in seeking to dismiss the claim for unjust enrichment, the City notes that it is permitted to use the annual grant to pay for operating costs under the City Code and that Charter received many financial benefits under the franchise.  *See* ECF No. 8-1 at 30-31.  The City fails to articulate the legal relevance of these observations.  Charter's claim is not that the City was barred from using the annual grant for operating expenses, but only that the grant must, in that

---

[8] The City also mentions other bases for dismissal, but they are too conclusory and undeveloped to merit analysis. *See Zannino*, 895 F.2d at 17.

circumstance, be treated as a franchise fee subject to the statutory cap. *See* ECF No. 1 ¶¶ 78-79. And the Court cannot discern how Charter's receipt of financial benefits through the franchise undercuts the crux of its claim for unjust enrichment: that, by threats of penalties and other sanctions, the City compelled Charter to pay money to the City (*i.e.*, the annual grant) to which it was not entitled under the TOA/franchise agreement (as modified by and mandated under federal law). *See Minnelli v. Soumayah*, 839 N.Y.S.2d 727, 728 (1st Dep't 2007) (stating that "extortionate behavior, coercion and duress may be elements of a cause of action for . . . unjust enrichment"). The Court declines to dismiss the claim for unjust enrichment on these grounds.

Therefore, the Court rejects all of the City's developed arguments for dismissal.

## CONCLUSION

For the reasons discussed above, the City's motion to dismiss (ECF No. 8) is DENIED. The City must file an answer within 21 days of entry of this Order.

IT IS SO ORDERED.

Dated: March 15, 2022
        Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

21